```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
NETTIE M. CURRY,

                 Plaintiff,              OPINION

        -against-                        06 Civ. 8319 (MGC)

AMERICAN INTERNATIONAL GROUP, INC.
PLAN NO. 502 and AMERICAN INTERNATIONAL
LIFE ASSURANCE COMPANY OF NEW YORK,

                 Defendants.

----------------------------------X

APPEARANCES:

        DWYER & BRENNAN
        Attorneys for Plaintiff
        7 Dey Street, Suite 1401
        New York, New York 10007

        By:  Kevin J. Brennan, Esq.


        WILSON, ELSER, MOSKOWITZ,
        EDELMAN & DICKER LLP
        Attorneys for Defendants
        3 Gannett Drive
        White Plains, New York 10604

        By:  Michelle M. Arbitrio, Esq.
```

**Cedarbaum, J.**

Nettie M. Curry sues American International Group, Inc. Plan No. 502 (the "Plan") and American International Life Assurance Co. of New York ("AI Life") under § 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for reinstatement of long-term disability benefits. Curry's benefits were terminated after AI Life determined that she was no longer disabled from performing the duties of "any occupation" under the terms of the Plan. Plaintiff and defendants move for summary judgment on undisputed facts. For the following reasons, Curry's motion for summary judgment is granted, and defendants' motion is denied.

BACKGROUND

Curry was employed by American International Group ("AIG") as a Regional Insurance Underwriting Manager until May 16, 2001. She is a participant in AIG's Plan, a long-term disability benefits plan issued by AI Life. The Plan is an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1). According to the Plan, AIG is the policyholder and plan administrator, but AI Life, the insurer, has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of [the Plan]."

2

Curry suffers from degenerative osteoarthritis in both knees and has had multiple surgeries on her knees.  She is also diabetic.  Her knee condition was primarily treated by her orthopaedic surgeon, Dr. Martin L. Sorger, at the Montclair Orthopaedic Group ("Montclair").  Due to her condition, Curry stopped working on May 16, 2001.  On October 15, 2001, she filed a claim for disability benefits with AI Life.

There are two tiers of benefits with distinct criteria under the Plan.  In the first tier, if the employee is disabled from performing the essential duties of her occupation, she is eligible to receive benefits for a period of two years.  After that two-year period, in order to continue receiving disability benefits, the employee must be disabled from performing the duties of any occupation for which she is "qualified by education, training or experience."

Benefits Approved

In a letter dated January 23, 2002, AI Life found that Curry was disabled from her occupation.  AI Life approved Curry's claim for benefits under the Plan, effective November 13, 2001.  On February 9, 2002, the Social Security Administration notified Curry that it found her to be disabled as of May 17, 2001, and

that she was entitled to disability benefits, effective November 1, 2001.

On May 19, 2003, AI Life initiated an investigation to determine if Curry would continue to qualify for disability benefits after November 13, 2003, the date on which the second phase of disability benefits would begin. As part of this investigation, AI Life sent Dr. Sorger a questionnaire and a "Physical Capacities Evaluation" form (collectively the "PCE") to gather information on Curry's ability to work. The PCE was signed by Dr. Sorger and returned to AI Life on February 26, 2004 with details on Curry's physical limitations. Among the answers given, Dr. Sorger indicated twice that Curry was not to return to work. He also noted that her condition was unlikely to change.

On March 17, 2004, AI Life determined that Curry's disability qualified for the second tier of benefits and approved her receipt of benefits after November 13, 2003.

## Benefits Revoked

Dr. Sorger retired from practice and left Montclair on April 30, 2004. AI Life followed up on its benefits determination by sending a letter addressed to Dr. Sorger on June 7, 2004 with further questions about Curry's physical capabilities. No response to that letter was received, so AI Life re-sent it via

facsimile on July 9, 2004.  An unsigned response to those questions from someone at Montclair was faxed back to AI Life on July 28, 2004.  Two of the relevant questions and answers read as follows:

> 1. In the Physical Capacity Evaluation (PCE), completed by you on 2/26/04, there was no indication of the length of time Ms. Curry could sit, stand, walk and drive within [an] 8 hour workday.  Would you please comment on this now?
>
> Ms. Curry can sit & drive reasonably unlimited in an 8 hour workday.  Standing & walking need[] to be minimized with her osteoarthritic knees.
>
> 2. You have indicated that Ms. Curry will not be able to return to work, however with the functionality given to Ms. Curry on the PCE she has the ability to perform a sedentary occupation.  Would you concur with this?
>
> The patient can perform a sedentary occupation.  I would agree with this.

AI Life sent another letter addressed to Dr. Sorger on August 6, 2004, inquiring as to Curry's "handling" motor skills. In the PCE, Dr. Sorger indicated that Curry could only occasionally perform "handling" activities, though she could frequently perform "fingering" skills.  AI Life's August 6, 2004 letter asked the following question: "If Ms. Curry can frequently do the fine motor skills of fingering and feeling, would she also be able to frequently perform the gross motor skill of handling?" An unsigned "yes" response, contradicting Dr. Sorger's initial finding, was sent to AI Life.

These new responses, received by AI Life from an unidentified person at Montclair after Dr. Sorger had already retired, were featured prominently in an Employability Analysis Report ("EAR") prepared by AI Life on September 14, 2004.  In the EAR, the unsigned responses from an unidentified person at Montclair in July and August of 2004 (the "unidentified Montclair responses") are treated as if they were from Dr. Sorger.  The EAR concluded that Curry was employable and listed four occupations in the insurance industry within her physical capabilities and prior work experience.

5

On September 27, 2004, AI Life informed Curry that her benefits were being terminated, effective September 30, 2004, because it found that she was no longer disabled from "any occupation." AI Life cited Dr. Sorger's PCE, the unidentified Montclair responses, and AI Life's EAR in making that determination. The letter indicates that AI Life again treated the unsigned and unidentified Montclair responses as responses from Dr. Sorger, despite the fact that Dr. Sorger was not at Montclair at that time.

AI Life sent Curry another letter on October 18, 2004 confirming its decision to terminate her benefits. That letter stated that AI Life had reviewed further documents from her medical file at Montclair, including notes from her last two visits on June 1, 2004 and October 5, 2004. Curry saw Dr. Mark D. Chase, an orthopaedic surgeon, on those visits. In the October 18, 2004 letter, AI Life stated that, according to a nurse at Montclair, Dr. Chase was the source of the unidentified Montclair responses. But further inquiry by Curry revealed conflicting information from Montclair, and ultimately no confirmation was forthcoming from Montclair as to the source of the unidentified Montclair responses. All parties agree that someone at Montclair other than Dr. Sorger sent the unidentified Montclair responses.

Curry's First Appeal

Before Curry filed a letter of appeal with AI Life, she was examined by Dr. James M. Lee, an orthopaedic surgeon, on October 13, 2004. Dr. Lee concluded that Curry "is completely and totally disabled from the job market." Curry filed her first appeal on October 21, 2004. In her appeal she noted Dr. Sorger's retirement prior to June of 2004, presented information obtained from Montclair that indicated that Dr. Chase was not the author of the unidentified Montclair responses, and attached a copy of Dr. Lee's report.

AI Life sent Curry's file for an external medical file review to Dr. Robert Y. Pick of the University Disability Consortium on October 28, 2004. In requesting the review, AI Life presented Dr. Pick, an orthopaedist, with the following instruction:

> Her attending physician, Dr. Sorger, has advised that she is capable of working, but she has now submitted a letter from an orthopedist that she is not capable. Please advise on her ability for full-time alternate work.

6

In addition to this misleading instruction, Dr. Pick's review of Curry's medical history included the unidentified Montclair responses and AI Life's EAR. He specifically mentions and considers the unidentified Montclair responses in his report. He also spoke with Dr. Lee before issuing his report. On November 15, 2004, Dr. Pick concluded that Curry "has a sedentary work ability and capacity for an eight-hour workday."

AI Life also had Curry appear for an independent medical examination and medical file review with Dr. Lewis Goodkin, an orthopaedic surgeon. Dr. Goodkin's February 2, 2005 report concludes that Curry's condition "does not preclude her from a sedentary position." An addendum, dated March 1, 2005, specifies the documents reviewed by Dr. Goodkin. Dr. Pick's report, AI Life's EAR, and the unidentified Montclair responses, attributed to Dr. Sorger, are specifically noted in Dr. Goodkin's addendum.

Curry sought her own independent medical examination and medical record review from Dr. Allen S. Glushakow, an orthopaedic surgeon. She was examined by him in November of 2004 and February of 2005. In his report dated March 30, 2005, Dr. Glushakow disagreed with Dr. Goodkin, and concluded that Curry is totally disabled and that her knee and other health conditions would prevent her from commuting regularly and performing a sedentary occupation.

On May 12, 2005, AI Life denied Curry's first appeal. The denial letter mentions Dr. Lee's examination report, Dr. Pick's file review report, Dr. Goodkin's examination report, and the EAR, but does not mention Dr. Glushakow's examination report.

First Appeal Denial Reaffirmed

AI Life obtained a second medical record review from Dr. Pick on June 28, 2005, which included Dr. Goodkin's and Dr. Glushakow's reports. Dr. Pick maintained his opinion that Curry could be employed in a sedentary occupation. On June 30, 2005, after reviewing Dr. Glushakow's examination report and Dr. Pick's second file review report, AI Life affirmed its denial of Curry's appeal.

Curry submitted two more medical reports to AI Life: a report dated August 29, 2005 from Curry's primary care physician, Dr. Peter Dabrowski, and a second examination report from Dr. Glushakow, dated October 12, 2005. Dr. Pick conducted a third file review on December 1, 2005 and reiterated his opinion that Curry could be employed in a sedentary occupation. On January 18, 2006, based on Dr. Pick's review, AI Life again upheld its denial of Curry's appeal.

## Curry's Second Appeal

Dr. Glushakow conducted a third examination of Curry and issued a report dated March 30, 2006, noting further limitations in Curry's physical capabilities due to her worsening knee condition. He concluded that she is "totally disabled," even from performing "light sedentary work" in an "easy job."

On April 11, 2006, Curry filed a detailed appeal of AI Life's denial of her benefits. The appeal cited Dr. Glushakow's findings and included a new report from Dr. Dabrowski regarding Curry's various health problems.

Dr. Lee performed another examination of Curry and issued a report dated June 21, 2006. Dr. Lee reviewed the reports of Dr. Pick and Dr. Goodkin and concluded that Curry's knee condition makes her "completely and totally disabled ... within reasonable medical probability ..., even for a sedentary position."

Curry sent another letter to AI Life on July 5, 2006 with further argumentation in support of her appeal. This letter included detailed reasons as to why Dr. Sorger's and Dr. Lee's reports should be given more weight than Dr. Pick's and Dr. Goodkin's reports. On July 21, 2006, AI Life responded to some of the concerns expressed in that letter, including questions regarding the unidentified Montclair responses. AI Life admitted knowledge of Dr. Sorger's retirement in April of 2004, but stated that the unidentified Montclair responses were nonetheless still considered part of Curry's claim file.

AI Life obtained a medical file review report dated August 23, 2006 from Dr. Phillip Marion, a physical medicine, rehabilitation, and pain management specialist, through Reed Review Services. Dr. Marion cited the unidentified Montclair responses and incorrectly attributed those conclusions to Dr. Sorger. Dr. Marion also spoke with Dr. Glushakow and Dr. Dabrowski and stated in his report that both doctors agreed, contrary to their own written reports, that Curry is "functionally capable of working at a sedentary level."

On September 28, 2006, AI Life issued its final denial of Curry's appeal, reviewing all of the reports submitted, including Dr. Marion's. The final denial letter discusses the unidentified Montclair responses and notes their importance in the denial of Curry's benefits: "Curry continued to meet the Total Disability provision up through the date of 07/29/04 when we received medical documentation from [Montclair]...." Rather than attribute the responses to Dr. Sorger, as AI Life had initially done in 2004 and as Dr. Pick, Dr. Goodkin, and Dr. Marion did as well, the letter attributes the unidentified

8

responses to Montclair generally.  AI Life concluded that "the weight of the medical evidence does not support" Curry's benefits claim, and that there is "no substantial evidence" that Curry "was not functionally able to perform the essential duties of any occupation as defined in the [Plan]."

Curry sued under 29 U.S.C. § 1132(a) for reinstatement of her long-term disability benefits.

DISCUSSION

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

ERISA plans "investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard." Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir. 2003).  See also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  That standard applies here because AIG's Plan grants AI Life "full discretion and authority to determine eligibility for benefits."  Under the deferential arbitrary and capricious standard, "[a] court may overturn a plan administrator's decision to deny benefits only if the decision was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Celardo, 318 F.3d at 146 (quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995)).  "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'" Id. (quoting Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995)) (brackets in Celardo).  "[A] district court's review under the arbitrary and capricious standard is limited to the administrative record."  Miller, 72 F.3d at 1071.

Under AIG's Plan, AI Life makes both eligibility determinations and benefits payments.  The Supreme Court recently held that:
> this dual role creates a conflict of
> interest; that a reviewing court should
> consider that conflict as a factor in
> determining whether the plan administrator
> has abused its discretion in denying

>             benefits; and that the significance of the
>             factor will depend upon the circumstances of
>             the particular case.

Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2346 (2008). The conflict of interest is "but one factor among many that a reviewing judge must take into account," id. at 2351, but it does not imply or require a change in the standard of review "from deferential to de novo review," id. at 2350.

Curry has not argued that AI Life's conflict of interest affected the reasonableness of its decisions. However, AI Life's conflict is one factor to be considered in determining whether AI Life "abused its discretion in denying benefits." Id. at 2346. See also id. at 2350; Firestone, 489 U.S. at 115 ("if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)) (brackets in Firestone).

### I. AI Life's Decision to Deny Benefits to Curry

AI Life's decision to deny disability benefits to Curry was arbitrary and capricious. Dr. Sorger was not the author of the unidentified Montclair responses, and none of the parties knows who the author was. It is unreasonable to rely on a medical opinion from an unknown individual in making a disability benefits determination. Montclair as an institution is an unreliable author because any individual working at Montclair's facility -- a doctor, nurse, or administrative assistant -- could have filled out the forms.

AI Life's initial denial of benefits on September 27, 2004 was without reason and unsupported by substantial evidence because it relied almost exclusively on the unreliable, unidentified Montclair responses. Of the four items cited in the initial denial of benefits, two represent the unidentified Montclair responses and one is the EAR produced by AI Life based on the unidentified Montclair responses. The EAR is an unreliable and inadequate source of information because it is based principally on the unidentified Montclair responses. The final source cited, Dr. Sorger's PCE, supports Curry's application for benefits because in the PCE Dr. Sorger stated twice that Curry was not to return to work, and he also noted that her condition was unlikely to improve.

AI Life knew that Dr. Sorger was not the author of the unidentified Montclair responses as early as October 18, 2004, when it wrote to Curry confirming denial of her benefits and

10

notifying her that it believed that Dr. Chase was the author of those responses.  That belief proved to be unfounded.  Yet AI Life did not reassess Curry's claim in light of the fact that Dr. Sorger's original opinion remained unchanged, and it did not amend its EAR.  Instead, it instructed Dr. Pick to conduct a medical file review and informed him, contrary to its actual knowledge at the time, that Dr. Sorger "has advised that she is capable of working."  In addition to this false and misleading instruction, Dr. Pick was provided with the unidentified Montclair responses and the flawed EAR as part of the medical record.

    Dr. Pick's review of November 15, 2004 was tainted by the misleading instruction and the unidentified Montclair responses falsely attributed to Dr. Sorger.  Without the unidentified Montclair responses, there was no recent medical opinion in the file indicating that Curry could work at a sedentary occupation.  Dr. Lee's examination report of October 13, 2004, which was reviewed by Dr. Pick, stated that she was totally disabled.  Yet Dr. Pick concluded otherwise despite the lack of any authentic medical opinion stating that Curry was not disabled from sedentary work.

    The other medical review and examination reports later relied upon by AI Life are similarly unsound.  Dr. Goodkin's February 2, 2005 examination report is unreliable because he relied on Dr. Pick's defective report, the flawed EAR, and the unidentified Montclair responses which were falsely attributed to Dr. Sorger.  Dr. Pick's second and third review reports are flawed because they build upon the mistaken assumptions and findings of his first report.  Dr. Marion's file review is defective because he relied on the unidentified Montclair responses and attributed them to Dr. Sorger.

    AI Life had the knowledge and ability to inform these doctors that Dr. Sorger was not the author of the unidentified Montclair responses, yet it chose not to do so.  By failing to correct that mistaken assumption, AI Life tainted the review process with a false repudiation from Dr. Sorger of his opinion that Curry was totally disabled from working.  In view of AI Life's conflict of interest, this failure to clarify the record is particularly disturbing.

    Furthermore, AI Life did not accord proper weight to the medical reports supplied by Curry's other doctors.  Dr. Lee's two examination reports, Dr. Glushakow's three examination reports, and Dr. Dabrowski's two examination reports were rejected without explanation in favor of Dr. Pick's three review reports, Dr. Goodkin's examination report, and Dr. Marion's review report, despite the lack of evidence that Curry's knee condition or overall health had improved.  ERISA provides that in denying

Curry's benefits, AI Life must "set[] forth the specific reasons for such denial" and afford Curry "a full and fair review" of the decision. 29 U.S.C. § 1133. AI Life failed to provide the specific reasons for concluding that Curry was not disabled based on all of the conflicting medical reports.

As is the case with AI Life's initial denials, AI Life's later denials of Curry's appeal on May 12, 2005, June 30, 2005, and January 18, 2006 were arbitrary and capricious. They relied on unsound medical reports and did not give proper weight to the medical reports presented by Curry.

In its final denial of Curry's appeal, AI Life again relied on the unidentified Montclair responses, describing them as responses from Montclair and not from Dr. Sorger. As discussed above, an anonymous medical opinion is not reliable for purposes of a disability claim under ERISA. The final denial relied on the same unsound reports from Dr. Pick, Dr. Goodkin, and Dr. Marrion, and again failed to articulate why the opinions of Dr. Sorger, Dr. Lee, Dr. Glushakow, and Dr. Dabrowski were subordinated to those of AI Life's own doctors. Thus, the final denial of Curry's appeal was arbitrary and capricious because it was without reason and was not supported by substantial evidence.

II. Alternative Grounds for Denial of Benefits

Defendants present two new justifications, not part of the administrative record, for terminating Curry's benefits: (1) that her benefits should terminate on the date that she refused the knee replacement surgery recommended by Dr. Sorger, and (2) that her benefits should terminate on the date that she refused to consider a modified work site or a reasonable alternative job identified in the EAR. Both of these arguments are without merit.

Dr. Sorger recommended bilateral knee replacement surgery in his PCE, and other doctors, such as Dr. Lee and Dr. Goodkin, also recommended that surgery. AIG's Plan provides that benefits will be terminated on "the date you refuse to receive recommended treatment that is generally acknowledged by physicians to cure, correct or limit the disabling condition." But, as noted above, AI Life must "provide adequate notice in writing ... setting forth the specific reasons" for denying Curry her benefits, and must afford Curry "a full and fair review" of the decision. 29 U.S.C. § 1133. See also 29 C.F.R. §§ 2560.503-1(g, j). This required disclosure informs claimants of the specific reasons for the denial of benefits and facilitates administrative review. See Juliano v. HMO of N.J., Inc., 221 F.3d 279, 287 (2d Cir. 2000).

12

AI Life never advised Curry that it was terminating her benefits because she declined to have knee replacement surgery. Without the required adequate notice, Curry did not have a full opportunity to get medical opinions regarding the risk entailed in knee replacement surgery which she feared because of her diabetic condition and prior family history of infections. Since this particular reason was never before disclosed to Curry, it cannot now be asserted to deny her benefits.

AIG's Plan also provides that benefits will be terminated on:

> the date you refuse to participate in a Rehabilitation program, or refuse to cooperate with or try ... modifications made to the work site or job process to accommodate your identified medical limitations to enable you to perform the Essential Duties of Your Occupation, or a reasonable alternative....

This second new justification for denial of Curry's benefits is also rejected for lack of adequate notice and lack of a full and fair review of that specific reason for denial of benefits. In addition, that justification fails because it relies on alternative employment opportunities listed in the defective EAR prepared by AI Life. Moreover, AI Life does not specify any work space modification that was offered to Curry.

III. Prejudgment Interest, Attorney's Fees, and Costs

Curry seeks an award including prejudgment interest, attorney's fees, and costs.

A. Prejudgment Interest

"[A] monetary award does not fully compensate for an injury unless it includes an interest component." Kansas v. Colorado, 533 U.S. 1, 10 (2001). "In a suit to enforce a right under ERISA, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court." Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir. 2000). The rate of prejudgment interest is also in the district court's discretion, and "the same considerations that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate." Id. In deciding whether to award prejudgment interest, the following factors should be considered: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii)

considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 955 F.2d 831, 834 (2d Cir. 1992).

AI Life's initial decision to deny Curry's benefits was made under the assumption that her treating orthopaedist, Dr. Sorger, revised his opinion as to her ability to work in a sedentary occupation. AI Life learned in October of 2004 that this assumption was not accurate. Rather than reassessing its decision and informing its reviewing doctors that Dr. Sorger did not change his opinion, AI Life allowed its mistake to pollute the rest of its review of Curry's appeal. AI Life's conduct deprived Curry of timely disability benefits, and she should be fully compensated with prejudgment interest. However, the parties have not briefed the issue of an appropriate prejudgment interest rate. Accordingly, the parties shall have two weeks from the date of this opinion to brief the issue of an appropriate prejudgment interest rate.

B. Attorney's Fees and Costs

In an action by a beneficiary to enforce her rights under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "In determining whether to make such an award, the court is ordinarily to consider 'five factors: (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.'" Jones, 223 F.3d at 138 (quoting Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987)).

AI Life should have taken steps to clarify its records to ensure that Curry would receive a full and fair review of her disability claim. In failing to do so, AI Life unnecessarily delayed Curry's receipt of benefits and caused both sides to incur litigation expenses. "An award of attorney's fees and costs is necessary both to relieve [Curry] of the financial burden undertaken to pursue this action, and to deter other [insurers] from similarly denying an applicant a fair consideration of his or her claim." Sansevera v. E.I. DuPont de Nemours & Co., 859 F. Supp. 106, 117 (S.D.N.Y. 1994). AI Life can afford to pay Curry's attorney's fees and costs.

Within two weeks of the date of this opinion, Curry shall submit time records that reflect both the hours spent by her attorney and the particular work performed in connection with this action.

## CONCLUSION

For the foregoing reasons, AI Life's decision to terminate Curry's disability benefits was arbitrary and capricious. The administrative record does not support a finding that Curry is capable of performing a sedentary occupation. Accordingly, Curry's motion for summary judgment is granted and defendants' motion is denied.

Judgment shall be entered for plaintiff and against defendants in an amount equal to the sum of the monthly benefits due to Curry under the Plan since October 1, 2004, plus prejudgment interest at a rate to be determined. By two weeks from the date of this opinion, the parties shall submit a calculation of the monthly benefit payments that Curry should have received since October 1, 2004, and shall recommend an appropriate prejudgment interest rate. Objections to such filings shall be submitted within one week after the initial submissions are served.

Curry is directed to document her attorney's fees within two weeks of the date of this opinion. Defendants may submit any objections to such documentation of attorney's fees within one week of its receipt.

SO ORDERED.

Date:   New York, New York
        September 10, 2008

S/_____
MIRIAM GOLDMAN CEDARBAUM
United States District Judge